THE ASHLAND.[1]

*(Circuit Court, E. D. Louisiana. February 12, 1884.)*

1. SALVAGE.
    Salvage refused in case where the facts showed that libelants should have had some knowledge of how the vessel got adrift, with her chains and ropes missing, she having been shown to have been securely fastened a short time before.

2. COSTS.
    Where both parties have unnecessarily encumbered the record, no costs will be allowed.

Admiralty Appeal.

*R. King Cutler*, for libelants.

*A. G. Brice, Joseph P. Hornor,* and *F. W. Baker,* for claimants.

PARDEE, J. The Ashland was undoubtedly cast adrift from the landing where she was tied by some person or persons, for unlawful purposes. If she was loosed from the shore the ropes and chains with which she was tied would have remained fastened to her, and been dragged along after her in her course down the river. If she was loosed from her deck or from aboard, the ropes and chains would have remained fast to the posts ashore. If she was loosed by casting off both ashore and aboard, the chains, at least, would have remained to show the fact. The shore showed signs of the ropes and chains having been dragged out as the boat went down stream, and neither ropes and chains were found attached to the mooring posts. The conclusion is irresistible that she was cast adrift by letting go the shore end of the ropes and chains with which she was moored, and that she dragged the ropes and chains out after her. The libelants say that they stood on the levee about one and one-half

---

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

squares above where the Ashland was tied, and saw a light out in the river which looked like a barge afloat, and which they boarded and found to be the Ashland. From where they say they stood it was impossible for them to have seen the Ashland "*out in the river,*" for they stood directly above where she was tied and from where she was cast adrift, without she was pulled out into the river. Unless she was pulled out, she would, of necessity, go down with the current, drifting directly away from libelants and not getting out into the river until a long distance further down stream; and it seems this was the fact, for when she passed the coal-yard, four squares below, she was from 100 to 150 feet out from the bank. From these facts it is safe to say that libelants boarded the Ashland either at or very near her landing. They should have found the ropes and chains attached and dragging after. They found nothing of the kind, except a piece of rope.

Taking the aforesaid facts into consideration, with the evidence of libelant Fisher, corroborated by libelant Deibel, and by Stubbs, Defuer, and Merchant, to this effect, "I was standing on the levee at Burdette street. Mr. Deibel and myself were together, and we started up the street, and stopped at Schilling's box factory, and Stubbs, Defuer, and Merchant came along, and *so I then saw a light out in the river,* and I said, 'Don't that look like a boat going down the river?' and they all said 'Yes, it does;' and then Deibel said, '*There is no harm in going to see;*' and then Deibel and Fisher went to Deibel's boat, already prepared with a 550-foot line,—it would appear that some explanation should be given of the means by which the Ashland got adrift, with her chains and ropes missing, before salvage should be awarded libelants, who, under the circumstances, should have had some knowledge of the matter.

This unfavorable view of libelants' demand for salvage, derived entirely from undisputed facts and circumstances in the case, renders it unnecessary for me to review and analyze the great mass of conflicting evidence brought up in the transcript. And it is a relief to me to escape this task, for, after a thorough examination and consideration of it all, I am unable to say on which side the truth lies. It is inexplicable to me that so much evidently manufactured evidence should be brought forward in such an originally trifling case. And it is not confined to one side; for, while the claimants have offered some ridiculously gotten-up stories as to a conspiracy on the part of libelants to cast the Ashland adrift, the libelants have not hesitated to swear away the reputation for truth of some highly respected and disinterested parties, personally known to me for years as men of fair reputation for honesty and veracity. And then the record shows all the details at length of a disgraceful transaction between Fisher, one of the libelants, and the agent of claimants, in regard to paying money for evidence, of which it is impossible to say from the evidence whether it was honest on either side. If Fisher was acting

honestly in this transaction, then the inference is strong that he was implicated in casting the Ashland adrift. That claimants' agent was acting honestly in the transaction can only be found at the expense of his intelligence. Swindling on the one side, and attempted subornation of perjury on the other, seems to be the most apparent conclusion from the showing made in the record. In the argument each side charged the other with the blame in incumbering the record with so much immaterial matter, so largely increasing costs in the case. Apparently the charge is correct, and on that account I deem it proper to divide the costs.

A decree will be entered in the case dismissing the libel, neither party recovering costs in the district court, but each party paying his own; the costs of this court, including cost of transcript, to be divided, each party to pay one-half.